IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

THOMAS N. LEIALOHA, as Personal ) Civ. No. 07-00218 ACK-KSC
Representative of the Estate of )
THANE K. LEIALOHA; CORNELIUS )
PACHECO, as Guardian Ad Litem )
for THEANE L. WHITE-LEIALOHA, )
JOSHUA T. WHITE-LEIALOHA, and )
KEOLA LEIALOHA, minors; SABRINA )
KAUAI, Individually and as )
Guardian Ad Litem for THANE )
LEIALOHA, JR., a minor, )
                                 )
            Plaintiffs,          )
                                 )
       v.                        )
                                 )
PETE MACDONALD; BRYAN WATANABE;  )
DOE DIRECTOR, DEPARTMENT OF      )
PUBLIC SAFETY; and JOHN AND/OR   )
JANE DOES 1-10,                  )
                                 )
            Defendants.          )
_____)

**SUPERSEDING ORDER GRANTING DEFENDANT PETE MACDONALD'S MOTION FOR SUMMARY JUDGEMENT; GRANTING DEFENDANT BRYAN WATANABE'S MOTION FOR SUMMARY JUDGMENT; AND DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT[1]**

**PROCEDURAL BACKGROUND**

On April 26, 2007, Thomas N. Leialoha, as the personal

representative of the estate of Thane K. Leialoha ("Decedent");

Cornelius Pacheco, as guardian ad litem for Theane L. White-

Leialoha, Joshua T. White-Leialoha and Keola Leialoha, minors;

---

[1] The Court's Order filed July 10, 2008, is hereby
withdrawn and superceded by this Order.

and Sabrina Kauai, individually and as guardian ad litem for
Thane Leialoha, Jr., a minor, (collectively "Plaintiffs") filed a
complaint ("Complaint") in the Court alleging the following
claims: (1) a 42 U.S.C. § 1983 claim for violation of Decedent's
constitutional rights against Pete MacDonald ("Defendant
MacDonald"), warden of the Hawaii Community Correctional Center
("HCCC"), Defendant Bryan Watanabe ("Defendant Watanabe"), Adult
Corrections Officer at the HCCC, and the unnamed Director of the
Department of Public Safety ("Defendant Director") (collectively
"Defendants"); a Hawaii state law claim of negligence against all
Defendants; a Hawaii state law claim of negligent infliction of
emotional distress against all Defendants; a Hawaii state law
claim of intentional infliction of emotional distress against all
Defendants; and a Hawaii state law claim of battery against all
Defendants.[2/]

On April 30, 2008, Defendant Watanabe filed a Motion
for Summary Judgment ("Watanabe's Motion") and a Concise
Statement of Material Facts in Support of the Motion for Summary
Judgment ("Watanabe's Concise Statement").  That same day,
Defendant MacDonald filed a Motion for Summary Judgment
("MacDonald's Motion") and a Concise Statement of Material Facts

---

[2/]  Plaintiffs concede that Defendant Director was never
served.  Therefore, the Court finds, and Plaintiffs agree, that
Defendant Director should be, and hereby is dismissed from this
case.

in Support of the Motion for Summary Judgment ("MacDonald's Concise Statement").[3/]

On May 7, 2008, Defendant MacDonald filed a Statement of No Opposition to Watanabe's Motion.  On May 8, 2008, Defendant Watanabe filed a Statement of No Opposition to MacDonald's Motion.

On May 9, 2008, Plaintiffs filed a Memorandum in Opposition to Defendants' Motions for Summary Judgment, and Plaintiffs' Cross-Motion for Summary Judgment as to Defendant Watanabe's Liability under § 1983 ("Opposition"). In conjunction with the Opposition, Plaintiff filed a Concise Statement of Facts and Counter-Concise Statement of Material Facts ("Plaintiffs' Concise Statement").

On May 16, 2008, Defendant Watanabe filed a Reply Memorandum in Support of his Motion for Summary Judgment, and Opposition to Plaintiffs' Cross Motion for Partial Summary Judgment ("Watanabe's Reply").  Along with the Reply, Defendant Watanabe filed a Response to Plaintiffs' Counter-Concise Statement of Material Facts.  That same day, Defendant MacDonald filed a Reply Memorandum in Support of his Motion for Summary Judgment ("MacDonald's Reply").

On May 28, 2008, the Court held a hearing to address

---

[3/]   Watanabe's Motion and MacDonald's Motion are collectively referred to as "Defendants' Motions."

Defendants' Motions ("Hearing").

**FACTUAL BACKGROUND**

On August 9, 2001, the Third Circuit Court in the State of Hawaii sentenced Decedent to ten years in prison for robbery in the second degree, five years for assault in the second degree, and five years for theft in the second degree. <u>See</u> Watanabe's Reply Ex. A. The first two counts were to run concurrently and the last count was to run consecutively. <u>Id.</u> Decedent was imprisoned and later released on parole.

Police arrested Decedent on April 9, 2006 for a parole violation, contempt of court, and two counts of failure to appear at a parole hearing. <u>See</u> Plaintiffs' Concise Statement at Ex. 1; <u>see also</u> Opposition at 9. Decedent was arraigned on April 11, 2006. Plaintiffs' Concise Statement at Ex. 1, p. 924. That afternoon, Defendant Watanabe and Adult Corrections Officer Darryl Almarza ("ACO Almarza") transported Decedent and nine other inmates from the Third Circuit Court to the HCCC. <u>See</u> Compl. ¶ 11. Defendant Watanabe was armed, but ACO Almarza was not. <u>See</u> Watanabe's Concise Statement Ex. 2 and Ex. A, Expert Report of Joseph E. Gunja ("Gunja Report") at 4.

While stopped at a red light on Haili street, near its intersection with Keawe street, Decedent unlocked his hand and leg restraints with a key he had smuggled into prison. <u>See</u> Plaintiffs' Concise Statement Ex. 4. Decedent then kicked or

pushed open the side door of the prison transportation van, and exited the vehicle without authorization.  See Compl. ¶ 14.  Upon hearing noise in the back of the van, Defendant Watanabe and ACO Almarza exited the vehicle, and ACO Almarza pushed the side door shut.  See Gunja Report at 4.  ACO Almarza noticed Decedent underneath the van and attempted to restrain him.  Id.  Decedent managed to evade ACO Almarza by rolling over to the driver's side of the van.  Id.  Defendant Watanabe approached Decedent and said "'nough already, give it up."  See Plaintiffs' Concise Statement Ex. 3, p. 6.  A struggle ensued between Decedent and Defendant Watanabe.  See Compl. ¶ 15.  Defendant Watanabe knew Decedent was a convicted felon, who he had seen going in and out of prison, and knew that Decedent bore a gang tattoo indicating that he was a member of a major prison gang.  See Plaintiffs' Concise Statement Ex. 3, pgs. 2, 18-19.

Defendant Watanabe kept telling Decedent to "give up" during their physical altercation.[4]  See Plaintiffs' Concise Statement Ex. 3, p. 6.  Defendant Watanabe asserts that Decedent reached for Defendant Watanabe's gun, at which time Defendant Watanabe spun away, and Decedent overpowered him and pushed him to the ground.  Id.  Decedent then began running down Haili street.  See Compl. ¶ 15.

---

[4]  Wesley Margheim ("Margheim"), an eye witness to the events, reported that he heard Defendant Watanabe yelling while struggling with Decedent.  See Gunja Report at 28.

Plaintiffs allege that Defendant Watanabe proceeded to shoot Decedent in the back of the head without any warning whatsoever. See Plaintiffs' Concise Statement at 2.  The other nine inmates in the transport van along with at least three nearby civilian witnesses reported that they did not hear Defendant Watanabe issue a warning before discharging his weapon. Id.

All nine other inmates were in the transportation vehicle when Defendant Watanabe discharged his weapon; and one inmate, Dominic Gomes ("Gomes"), told investigators that the other inmates were so loud that he could hardly even hear the shot fired.  See Gunja Report at 17.  Two of the civilian witnesses, Jennifer Sawkins ("Sawkins") and Vanessa Taube ("Taube") saw the incident from their pick-up truck with the windows rolled up.  Id. at 24-25.  Ryan Pagan ("Pagan"), reported that he did not hear Defendant Watanabe yell "stop;" while he watched the incident through the store window of a gym.  Id. at 27.

On the other hand, Sheldon Haili ("Haili"), a "good friend" of Decedent whom he met while incarcerated, initially told television reporters that he heard Defendant Watanabe yell "stop" before firing his weapon.  Id. at 27.  When Haili was later questioned by police, he said he did not hear Defendant Watanabe yell "stop" before firing his weapon; but when he was

reminded about his statement to television reporters, he said he could not recall whether Defendant Watanabe had yelled "stop" or not.  Id.

Defendant Watanabe states that he ordered Decedent to "stop" before shooting.  After issuing the warning, Defendant Watanabe states that he drew his firearm, aimed at the "center mass" of Decedent's body and fired one shot.  That shot hit Decedent in the back of his head.  See Gunja Report at 23; see also Plaintiffs' Concise Statement Ex. 3, p. 6.  Similarly, ACO Almarza stated that he heard Defendant Watanabe yell "stop" before firing his weapon.  See Gunja Report at 29, 31.  Decedent died that afternoon.

## STANDARD

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.'" Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal citation omitted).[5/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 323; see also Miller v. Glenn Miller Productions, 454 F.3d 975, 987 (9th Cir. 2006).  The moving party may do so with affirmative evidence or by "'showing'--that is pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.[6/]

_____

[5/]  Disputes as to immaterial issues of fact do "not preclude summary judgment." Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

[6/]  When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  See Miller, 454 F.3d at 987 (quoting C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc., 213 F.3d 474, 480 (9th Cir. 2000)).  When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See Celotex, 477 U.S. 323; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[7]  The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  Thus, summary judgment will be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  See T.W. Elec. Serv., 809 F.2d at 630-31.[8]  Accordingly, if

---

to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party.  Id.

[7]  Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

[8]  At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Bator v. State of Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

"reasonable minds could differ as to the import of the evidence,"
summary judgment will be denied.  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 250-51 (1986).

## DISCUSSION

**I.   DEFENDANT WATANABE**

**A.   Section 1983 Claims**

To state a claim under § 1983, a plaintiff must show:
(1) a violation of a right secured by the Constitution and laws
of the United States; and (2) that the deprivation was committed
by a person acting under color of law.[9/]  See West v. Atkins, 487
U.S. 42, 48 (1988).  The Court will first address the merits of
Plaintiffs' § 1983 claims against Defendant Watanabe in his
official capacity, then in his individual capacity and finally
address whether he is entitled to qualified immunity.

**1.   Official Capacity**

Defendant Watanabe in his official capacity argues that

---

[9/]   42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen
> of the United States or other person within the
> jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity,
> or other proper proceeding for redress.

the Eleventh Amendment immunizes him from Plaintiffs' § 1983

claims.   The Eleventh Amendment to the United States Constitution

provides:

> The Judicial power of the United States shall
> not be construed to extend to any suit in law
> or equity, commenced or prosecuted against
> one of the United States by Citizens of
> another State, or by Citizens or Subject of
> any Foreign State.

U.S. Const. amend. XI.

   The Eleventh Amendment shields a state from suit in

federal court unless the state consents.   See Edelman v. Jordan,

415 U.S. 651, 673 (1974).   A suit against a state official acting

in his or her official capacity is tantamount to a suit against

the state.   See Hafer v. Melo, 502 U.S. 21, 25 (1991); see also

Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)

(holding that "a suit against a state official in his or her

official capacity is not a suit against the official but rather

is a suit against the official's office[, and therefore] is no

different from a suit against the State itself") (citations

omitted)); Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) ("[A]n

official-capacity suit is, in all respects other than name, to be

treated as a suit against the entity."); Flint v. Dennison, 488

F.3d 816, 824-25 (9th Cir. 2007).   Therefore, Defendant Watanabe,

in his official capacity, shares the immunities of the State of

Hawaii.   See, e.g., Mitchell v. Los Angeles Cmty. College Dist.,

861 F.2d 198, 201 (9th Cir. 1988).

Section 1983 does not override the Eleventh Amendment immunity of a state.  See Quern v. Jordan, 440 U.S. 332, 339-41 (1979).  Moreover, the State, its agencies, and its officials in their official capacities are not "persons" that can be sued under § 1983.  See Will, 491 U.S. at 70-71.  Accordingly, the Court finds that Plaintiffs' § 1983 claim against Defendant Watanabe in his official capacity is barred by the Eleventh Amendment.  Thus, the Court grants Defendant Watanabe's Motion with regard to Plaintiffs' § 1983 claim against him in his official capacity.[10]

### 2. Individual Capacity

#### a. Excessive Force

Plaintiffs first allege that Defendant Watanabe's use of excessive force violated Decedent's constitutional rights.  Not all excessive force claims brought under § 1983 are governed by a single generic standard of review.  See Graham v. Connor, 490 U.S. 386, 393-94 (1989).  "In addressing an excessive force claim brought under § 1983, the analysis begins by identifying the specific constitutional right allegedly infringed [upon] by the challenged application of force."  Id. at 394 (citing Baker

---

[10] The Court notes that at the Hearing, Plaintiffs conceded that all their claims against Defendant Watanabe, in his official capacity, are barred.  See Hearing Transcript ("Tr.") at 20.

v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  The validity of the claim must then be determined by reference to the constitutional standard which governs the right, rather than to a more generalized excessive force standard.  Id.; compare Tennessee v. Garner, 471 U.S. 1, 7-22 (1985) (applying the Fourth Amendment standard to a claim of excessive force to effect an arrest), with Whitley v. Albers, 475 U.S. 312, 318-26 (1986) (applying the Eighth Amendment standard to a claim of excessive force to subdue a convicted prisoner), with White v. Roper, 901 F.2d 1501, 1507 (9th Cir. 1990) (applying the Fourteenth Amendment's Substantive Due Process standard to a claim of excessive force against a pretrial detainee).  The custodial status of the victim determines the applicable constitutional amendment.  See Graham, 490 U.S. at 393-94.

To determine the appropriate standard to apply in this case, the Court must first determine where Decedent fell on the custodial continuum and accordingly, what constitutional protections governed.  See Pierce v. Multnomah County, 76 F.3d 1032, 1042 (9th Cir. 1996)(ruling that "the custodial continuum run[s] through the initial arrest or seizure, post-arrest but pre-charge or pre-hearing custody, pretrial detention, and post-conviction incarceration") (citing Austin v. Hamilton, 945 F.2d 1155, 1158 (10th Cir. 1991)).

The Supreme Court has recognized that the Fourth

Amendment's objective reasonableness standard governs § 1983 claims based on excessive force during the "arrest, investigatory stop, or other 'seizure' of a free citizen." See Graham, 490 U.S. at 394. Post-arraignment detainees are entitled to the protections of the Fourteenth Amendment's Substantive Due Process Clause.[11/] Id.; See, e.g., Grinage v. Lebya, Civ. No. 06-0835, 2007 WL 199720, *4-*5 (D. Nev. Jan. 17, 2008); Henderson v. City and County of San Francisco, Civ. No. 05-0234, 2007 WL 2778682, *3 (N.D. Cal. Sept. 21, 2007) (holding that the Fourteenth Amendment's Substantive Due Process Clause governs claims of excessive force against post-arraignment but pretrial detainees); Cf. Pierce, 76 F.3d at 1043 (holding that the Fourth Amendment reasonableness standard applies to allegations of use of excessive force against a pretrial detainee, who had not yet been arraigned). Finally, post-conviction, the Eighth Amendment "serves as the primary source of substantive protection in cases where the deliberate use of force is challenged as excessive and unjustified." Graham, 490 U.S. at 395 n. 10 (internal citations omitted) (quoting Whitley, 475 U.S. at 1084-85).[12/] Individuals

---

[11/] The Court notes that at least one district court concluded that, as a matter of first impression in the Ninth Circuit, the Due Process Clause governed an excessive force claim brought by a post-arraignment but pre-conviction detainee. See Henderson v. Young, Civ. No. 05-0234, 2008 WL 564712, *1 (N.D. Cal. Feb. 28, 2008) (Fletcher, J.).

[12/] In the Complaint, Plaintiffs allege this action was brought to redress the deprivation of Decedent's rights secured

that have already been convicted are entitled to less

constitutional protections because "the State has [already]

complied with the constitutional guarantees traditionally

associated with criminal prosecutions."  See Whitley, 475 U.S. at

318.

Plaintiffs argue in their Opposition that Decedent, as

a pretrial detainee, is entitled to the protections of the Fourth

Amendment.[13/]  See Opposition at 9.  Defendants generally agree

---

by the "Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments
to the Constitution."  See Compl. ¶ 1.  Plaintiffs present no
case law or argument in support of their claim that Defendants
violated Decedent's rights under the Fifth or Ninth Amendments to
the Constitution.  Allegations and contentions unsupported by any
explanation or authority are deemed waived.  See FDIC v. Garner,
126 F.3d 1138, 1145 (9th Cir. 1997) (holding that a claim was
waived when no case law or arguments were presented to support
it).  Thus, the Court will not analyze these claims.  See Carmen
v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 (9th
Cir. 2001) (stating that a judge need not consider on summary
judgment materials outside the motion papers and references
therein); see also Pelfrensne v. Village of Williams Bay, 917
F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a
point by supporting it with pertinent authority, or by showing
why it is sound despite a lack of supporting authority or in the
face of contrary authority, forfeits the point . . . We will not
do his research for him.").

[13/] The Court notes that in Count One of the Complaint (the
only count against Defendant Watanbe addressing a constitutional
violation), Plaintiffs allege that "[Decedent] was subjected to
cruel and unusual punishment and/or denied due process of law,
inter alia, in violation of rights guaranteed to him by the
United States Constitution, 42 U.S.C. Section 1983, and the
Constitution and other laws of the State of Hawai'i, inter alia."
See Compl. ¶ 23.  Thus, Plaintiffs actually alleged in the
Complaint that Decedent's Eighth and Fourteenth Amendment rights
("inter alia") were violated.  Still, the Court will address
Plaintiffs' argument that Defendant Watanabe violated Decedent's
Fourth Amendment rights, as articulated in the Opposition.

that Decedent was a pretrial detainee, but further contend that because Decedent was also a convicted felon serving his sentence as a parolee, he was only entitled to Eighth Amendment protections.  See Watanabe's Reply at 3; see also MacDonald's Reply at 4.

Plaintiffs cite two ninth circuit opinions in support of their contention that pretrial detainees are afforded Fourth Amendment protections.  See Lolli v. County of Orange, 351 F.3d 410, 415-16 (9th Cir. 2003); see also Gibson v. County of Washoe, 290 F.3d 1175, 1197 (9th Cir. 2002).  In analyzing these cases, the Court must first address the Ninth Circuit's decision in Pierce, the case upon which both these decisions rely.  In Pierce, 76 F.3d at 1036, a woman, arrested for boarding a train without proof of payment, alleged that she was subject to excessive force prior to her arraignment.  The court held that the Fourth Amendment set the applicable constitutional limitations for the treatment of an arrestee detained without a warrant until such time as he is "release[d] or found to be legally in custody based upon the probable cause for arrest." See Pierce, 76 F.3d at 1043 (emphasis added).  Gibson and Lolli relied on Pierce.  In Gibson, 290 F.3d at 1180, the wife of a manic depressive arrestee filed a § 1983 claim alleging that officers employed excessive force when detaining her husband. Relying on Pierce, the court held that "we have determined that

16

the Fourth Amendment sets the 'applicable constitutional limitations' for considering claims of excessive force during pretrial detention." <u>Gibson</u>, 290 F.3d at 1197 (quoting <u>Pierce</u>, 76 F.3d at 1043).  This statement was quoted by the Ninth Circuit in <u>Lolli</u>, 351 F.3d at 415, another pre-arraignment case.  While these cases stand for the proposition that pre-arraignment, pretrial detainees are afforded Fourth Amendment protections against excessive force, they do not support Plaintiffs' contention that Decedent, a post-arraignment detainee, is entitled to those same protections.

Therefore, the Court finds that the concept of "seizure," as articulated by the Fourth Amendment, is not so expansive as to cover post-arraignment detention.  The Court is not alone in declining to interpret <u>Gibson</u> as applying Fourth Amendment protections to post-arraignment detainees.  <u>See e.g.</u>, <u>Brooks v. Fong</u>, Civ. No. 07-2615, 2008 WL 648467, *1 (N.D. Cal. Mar. 5, 2008) (holding that the Due Process Clause protects post-arraignment pretrial detainees from excessive force); <u>Henderson</u>, 2008 WL 564712 at *1; <u>Grinage</u>, 2008 WL 199720 at *4-*5 (same); <u>Guillory v. Rupf</u>, Civ. No. 05-4395, 2007 WL 2881954, *6 (N.D. Cal. Sept. 27, 2007) (same).

This was not a situation in which an officer allegedly used excessive force during an arrest or immediately thereafter. This was a situation in which a convicted felon violated his

parole, was arraigned on new charges, and attempted escape. "The use of force to recapture an escaped convict creates a different problem than the use of force to apprehend a nonviolent fleeing felony suspect." Gravely v. Madden, 142 F.3d 345, 349 (6th Cir. 1998).  Thus, the Court finds that Decedent, a convicted felon and a post-arraignment detainee, is not afforded Fourth Amendment protections.

Accordingly, the Court must determine whether the Fourteenth or Eighth Amendment applies.  While on the one hand Decedent was a post-arraignment detainee; on the other hand he was a convicted felon still serving his sentence on parole.  See Graham, 490 U.S. at 394; see also Rankin v. Klevenhagen, 5 F.3d 103 (5th Cir. 1993) (applying an Eighth Amendment standard to a § 1983 excessive force claim brought by a pretrial detainee, who at the time of arrest, was on parole); Cf. U.S. v. Paskow, 11 F.3d 873, 881 (9th Cir. 1993) (holding that a parolee is still serving his sentence while released from  prison).  Because Decedent was still serving his sentence as a convicted felon, the Court finds that he was only entitled to the protections of the Eighth Amendment.

### i.   Eighth Amendment Analysis

"After incarceration only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  Whitley, 475 U.S. at 319

18

(citations and internal quotation marks omitted).  The standard for establishing the unnecessary and wanton infliction of pain varies according to the nature of the alleged constitutional violation.  See Hudson v. McMillian, 503 U.S. 1, 5 (1992); Whitley, 475 U.S. at 320.

The Eighth Amendment legal inquiry in use of force cases involves both a subjective and objective component.  See Hudson, 503 U.S. at 8.  As the Hudson Court has explained, "courts considering a prisoner's claim must ask both if the officials act[ed] with a sufficiently culpable state of mind and if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." Id. (internal quotation marks omitted) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  The objective component of an Eighth Amendment use of force claim is "contextual and responsive to 'contemporary standards of decency.'" Id. (quoting Estelle v. Gamble, 329 U.S. 97, 103 (1976)).  In use of force cases, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." Id. at 9 (citing Whitley, 475 U.S. at 327).

Therefore, the Hudson Court explained that whenever a law enforcement official stands accused of using excessive force in violation of the Eighth Amendment, the core inquiry is "whether force was applied in a good-faith effort to maintain or

19

restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 6-7; <u>see also</u> <u>Graham</u>, 490 U.S. at 399 n. 11; <u>Whitley</u>, 475 U.S. at 320-21; <u>Clement v. Gomez</u>, 298 F.3d 898, 903-04 (9th Cir. 2002).  Maliciousness is based on the subjective motivations of the official in question.  See <u>Graham</u> 490 U.S. at 397.  In <u>Whitley</u> the Supreme Court prescribed the following analysis:

> the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm. . . . such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted, are relevant to that ultimate determination. From such considerations inferences may be drawn as to whether the use of force could have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.

<u>Whitley</u>, 475 U.S. at 320-21 (internal quotation marks and citations omitted).  Subsequently, the <u>Hudson</u> Court redefined the relevant factors derived from <u>Whitley</u>: (1) the extent of the injury suffered; (2) the need for application of force, (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response.  See <u>Hudson</u>, 503 U.S. at 7 (citing <u>Whitley</u>, 475 U.S.

at 321).

### (a)   Extent of Injury

"The extent of injury suffered by an inmate is one
factor that may suggest whether the use of force could plausibly
have been thought necessary in a particular situation, or
instead evidenced such wantonness with respect to the
unjustified infliction of harm as is tantamount to a knowing
willingness that it occurred." Hudson, 503 U.S. at 7 (internal
quotation marks omitted) (quoting Whitley, 475 U.S. at 321).
Although this factor is relevant in determining whether the use
of force violated the Eighth Amendment, it is not decisive. Id.
at 4.  Here, Defendant Watanabe aimed for the center mass of
Decedent pursuant to prison policy and did not intend to kill
him.  Even still, the extent of Decedent's injuries could not be
greater - he was shot and killed.

### (b)   Need for Force

There was a strong need for the application of force
in this case.  As noted above, Decedent was a convicted felon in
custody for outstanding warrants for a parole violation,
contempt of court and two counts of failure to appear at a
parole hearing. See Plaintiffs' Concise Statement at Ex. 1;
Opposition at 9.  Moreover, Plaintiffs concede that Decedent
used a smuggled key to free himself from his restraints.  He
escaped from the transportation van, eluded ACO Almarza,

21

attempted to grab Defendant Watanabe's gun, and overpowered Defendant Watanabe through the use of physical violence; all in an effort to escape.   Notwithstanding these circumstances, Plaintiffs maintain that there was no need to shoot Decedent and that Defendant Watanabe should have either pursued Decedent or let him escape.   See Opposition at 7.

DPS policy entitled "Preventing, Apprehending and Reporting of escapes" ("ERC 03.01") states that, "[i]f an escape or escape attempt occurs in the community, escorting officers shall initiate immediate pursuit, if circumstances permit."   See Gunja Report at 6.   In addition, the procedure requires that "all other means of apprehension and control shall be exhausted" before an officer is to use deadly force.[14]   Id.   Here, the Court finds that the circumstances did not permit Defendant Watanabe to pursue Decedent, nor was it reasonable for him to let Decedent escape.   Defendant Watanabe was the only armed guard on duty in the transportation van.   If he were to chase Decedent he would have had to abandon ACO Almarza with the nine remaining inmates when, given the circumstances of which Defendant Watanabe was aware, it appeared by Decedent's ability to free himself of his restraints, that their escape from the transportation van was likewise possible.   Pursuit by Defendant

---

[14] As the Court explains more fully below, the Court finds that this procedure is constitutional. See Gravely, 142 F.3d at 349 (finding that a similar procedure was constitutional).

Watanabe would have left ACO Almarza in a potentially very dangerous position.  Defendant Watanabe knew Decedent was a convicted felon, who he had seen going in and out of prison.  See Plaintiffs' Concise Statement Ex. 3, pgs. 2, 18-19.  Decedent overpowered Defendant Watanabe and reached for his gun before he attempted to escape from custody.  It is clear from these facts that Decedent posed a danger.  Thus, the Court finds that the circumstances did not permit Defendant Watanabe to chase Decedent and that all other means of apprehension and control were exhausted.  Consequently, the Court concludes that there was a need for the application of force, namely shooting at Decedent's "center mass."

### (c)   Relationship Between Need for Force and Force Used

"Whether the disturbance is a riot or a lesser disruption, correction officers must balance the need to 'maintain or restore discipline' through force against the risk of injury to inmates."  Hudson, 503 U.S. at 6.  As the Whitley Court noted, "[i]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used."  Whitley, 475 U.S. at 320.  This general principle applies to escape attempts that occur

during the transportation of prisoners.  See generally, Brothers
v. Klevenhagen, 28 F.3d 452, 454-58 (5th Cir. 1994)(applying
Whitley principles to an attempted escape during the
transportation of pretrial detainee).

Here, Defendant Watanabe explained that after being
overpowered by Defendant and yelling for him to "stop," he aimed
at the "center mass" of Decedent's body pursuant to DPS policy,
and fired one shot.  Unfortunately Decedent was hit in the back
of his head which resulted in his death.  See Gunja Report at 5;
see also Plaintiffs' Concise Statement Ex. 3, p. 6.  As noted
supra, Decedent was a convicted felon who overpowered Defendant
Watanabe in an attempt to escape from custody.  Thus, the Court
finds there was a need for force to prevent Decedent's escape
and that Defendant Watanabe had exhausted all force available
other than shooting at Decedent's center mass.

### (d)  Threat Perceived

Another relevant inquiry for determining whether an
Eighth Amendment use of excessive force violation has occurred
is "the extent of the threat to safety of staff and inmates, as
reasonably perceived by the responsible officials on the basis
of the facts known to them . . ."  Whitley, 475 U.S. at 321.  In
analyzing these Hudson factors, the Court must take into
consideration the fact that corrections officers usually make
their decisions to use force "in haste, under pressure, and

frequently without the luxury of a second chance." <u>Hudson</u>, 503
U.S. at 6 (quoting <u>Whitley</u>, 475 U.S. at 320).

     Here, Plaintiffs argue that Defendant Watanabe did not
reasonably perceive Decedent as a threat when he fired his
weapon. <u>See</u> Opposition at 8. In support of their argument,
Plaintiffs cite an internal investigation interview in which
Defendant Watanabe testified that he did not recall thinking at
the time that others may be in danger if Decedent successfully
escaped. <u>See</u> Plaintiffs' Concise Statement Ex. 3, p. 17.
However, Defendant Watanabe also reported that he was afraid for
his life and the life of his partner. <u>Id.</u> Moreover, Defendant
Watanabe knew Decedent was a convicted felon. As noted <u>supra</u>,
Defendant Watanabe was involved in a struggle with Decedent
where Defendant Watanabe reported that he felt Decedent reach
for his weapon. After Decedent overpowered Defendant Watanabe,
he began running down the street in an effort to escape.
Moreover, Defendant Watanabe could not chase Decedent because of
the potential threat of the other nine inmates freeing
themselves of their restraints and harming ACO Almarza who was
unarmed. Therefore, the Court finds that under these facts
Defendant Watanabe had enough information to reasonably perceive
the threat of Decedent's escape necessitated aiming at his
center mass and shooting him in order to restore control.

     **(e) Efforts to Temper Force**

During the course of the attempted escape, Defendant Watanabe increased the amount of force he used in response to Decedent's attack.  When Defendant Watanabe was struggling with Decedent he repeatedly told Decedent to give up.  See Plaintiffs' Concise Statement Ex. 3, p. 6.  Furthermore, before firing at Decedent, Defendant Watanabe shouted to Decedent to "stop."  Accordingly, the Court finds that Defendant Watanabe made efforts to temper the use of force before firing his weapon.

### ii.   Eighth Amendment "Ultimate Determination"

Plaintiffs argue that Defendant Watanabe acted maliciously and sadistically in shooting Decedent.  See Compl. ¶ 23.  In support of their argument, Plaintiffs allege that Defendant Watanabe did not yell "stop" before firing his weapon at Decedent.  If this is the case, Plaintiffs contend that Defendant Watanabe violated Department of Public Safety ("DPS") policy entitled "Use of Force" ("ERC 14.01").[15/]  Plaintiffs contend that the nine other inmates transported with Decedent along with three nearby civilian witnesses corroborate this fact.  See Plaintiffs' Concise Statement at 2.  The Court

---

[15/] ERC 14.01 states in relevant part that "[i]f time permits, before firing a shot at an inmate, a warning must first be communicated in some readily understandable fashion by shouting.  If the inmate continues their activities despite the oral warning, firearms may be used as a last resort to stop the potential escapee." See Gunja Report at 5.

disagrees.  Gomes, one of the other inmates in the
transportation van, told investigators that the noise in the van
from the other inmates' excitement was so loud that he could
barely hear Defendant Watanabe fire his gun.  See Gunja Report
at 17.  Thus, the other nine inmates were not in a position to
hear Defendant Watanabe yell anything.  As noted supra, Sawkins
and Taube witnessed the shooting from their pick-up truck with
the windows rolled up, and Pagan watched the incident through
the gym window.  Id. at 24-25, 27.  These witnesses evidently
were not in a position where they could hear Defendant
Watanabe's warning to Decedent.

          On the other hand, Defendant Watanabe asserts that he
issued a warning to Decedent before firing his weapon.
Defendant Watanabe reported to investigators that during his
struggle with Decedent he kept telling Decedent to "give up."
See Plaintiffs' Concise Statement Ex. 3, p. 6.  This is
confirmed by Margheim who reported that he heard Defendant
Watanabe yelling during his struggle with Decedent.  See Gunja
Report at 28.  Defendant Watanabe explained that after he was
overpowered in his struggle with Decedent, he issued an
additional warning to Decedent by shouting "stop" before
discharging his weapon.  Defendant Watanabe then stated that he
aimed "center mass," as officers are taught to do, and fired one
shot, unfortunately hitting Decedent in the back of his head.

See Gunja Report at 5; see also Plaintiffs' Concise Statement
Ex. 3, p. 6.  Defendant Watanabe's interpretation of the
incident is corroborated by ACO Almarza, who stated that he
heard Defendant Watanabe yell "stop" before firing his weapon.
See Gunja Report at 29, 31.  In addition, Haili, who said he was
a good friend of Decedent whom he met when they both were
incarcerated, explained in a television interview that he heard
Defendant Watanabe yell "stop" before he discharged his firearm
(although he later tried to renege on this statement by saying
he could not recall whether or not Defendant Watanabe shouted a
warning).  Id. at 27.

     Even assuming Defendant Watanabe did not yell "stop"
before discharging his weapon, and did violate ERC 14.01, which
the Court finds is not the case, Plaintiffs still have not shown
that Defendant Watanabe acted maliciously or sadistically in
shooting Decedent.  See Whitley, 475 U.S. at 324 (holding that
the failure to issue a verbal warning did not preclude summary
judgment, although in that case, a warning shot had been fired);
see also Kinney v. Indiana Youth Center, 950 F.2d 462, 466 (7th
Cir. 1991) (ruling that an officer acted in good faith when he
shot an escaping prisoner whether or not he first issued a
warning).  A violation of ERC 14.01 alone would not render
Defendant Watanabe liable for an Eighth Amendment use of force
claim because a violation of a DPS policy does not show

28

Defendant Watanabe acted maliciously or sadistically to cause harm to Decedent.  See Morgan v. Doran, Civ. No. 02-6316, 2007 WL 781903, *2 (E.D. Cal. Mar. 13, 2007) (holding that a violation of state tort law or regulations is not sufficient to prove a violation of a constitutional right).

Here, the Court finds absolutely no evidence that Defendant Watanabe acted maliciously or sadistically considering the circumstances.  Decedent, a convicted felon, used a smuggled key to remove his hand and leg restraints.  See Gunja Report at 4, 13, 16.  Decedent pushed or kicked open the van door, slid under the van and eluded ACO Almarza's attempt to restrain him. Decedent engaged in a struggle with Defendant Watanabe, reached for Defendant Watanabe's gun and eventually overpowered him in his effort to unlawfully escape custody.  Defendant Watanabe was not in a position to chase Decedent because he would have been forced to abandon ACO Almarza, who was unarmed at the time, with the nine other inmates.  The evidence is unclear as to how the other nine inmates were shackled but as far as Defendant Watanabe knew, they too could have freed themselves from their restraints and overpowered ACO Almarza.  Furthermore, Defendant Watanabe reported that he feared for his life and the life of his partner.  See Plaintiffs' Concise Statement Ex. 3, p. 17. While they were struggling, Defendant Watanabe had warned Decedent to "give up," and Defendant Watanabe shouted at

29

Decedent to "stop" before firing his weapon.  Decedent's attempted escape required Defendant Watanabe to "act quickly and decisively" which the Court must consider in making its determination.  See Hudson, 503 U.S. at 6.  The Court finds that Decedent's attempted escape left Defendant Watanabe with no option but to draw his gun and shoot Decedent, aiming at his "center mass," as instructed.

In sum, in accordance with the analysis as instructed in Whitley, the Court finds the Hudson factors establish Defendant Watanabe's use of force "could plausibly have been thought necessary."  Whitley, 475 U.S. at 321.  The Court finds that Defendant Watanabe acted in good faith and to restore discipline and not maliciously or sadistically to cause harm to Decedent.  Therefore, the Court concludes that the force inflicted was neither wanton nor unnecessary.  The findings and conclusions by this Court are fully supported by the expert opinion of Joseph E. Gunja.  See Watanabe's Concise Statement Ex. 2 and Ex. A (Expert Report of Joseph E. Gunja).  Based on the evidence submitted and viewing the facts in the light most favorable to Plaintiffs, the Court finds that Defendant Watanabe did not violate Decedent's Eighth Amendment rights and that a reasonable jury could not find otherwise.

### iii. Fourteenth Amendment Analysis

Even if the Court determined that Decedent, as a post-

30

arraignment detainee, was entitled to the protections of the
Fourteenth Amendment, the Court would still find no
constitutional violation.  To prevail on a claim for excessive
force under the Substantive Due Process Clause of the Fourteenth
Amendment, Plaintiffs would have to show that Defendant
Watanabe's actions "shock the conscience."  <u>See</u> <u>County of
Sacramento v. Lewis</u>, 523 U.S. 833, 855 (1998).  Several circuit
and district courts have held that excessive force claims
brought by pretrial detainees under the Fourteenth Amendment are
analytically identical to those brought by prisoners under the
Eighth Amendment.  <u>See</u> <u>United States v. Walsh</u>, 194 F.3d 37, 48
(2d Cir. 1999); <u>Orem v. Rephann</u>, 523 F.3d 442, 446 (4th Cir.
2008) (applying Fourteenth Amendment protections during pre-
arraignment detention); <u>see</u> <u>also</u> <u>Cooksey v. Fields</u>, Civ. No. 06-
383, 2007 WL 2781248, *5 (N.D. Cal. Sept. 20, 2007) (applying
Fourteenth Amendment protections during post-arraignment
detention); <u>Henderson v. City and County of San Francisco</u>, Civ.
No. 05-234, 2006 WL 3507944, *3 (N.D. Cal. Dec. 1, 2006) (same).
While the Ninth Circuit has not specifically addressed whether a
post-arraignment detainee is entitled to the protections of the
Fourteenth Amendment, it has used the <u>Hudson</u> and <u>Johnson</u> factors
as a benchmark for evaluating excessive force claims brought
under the Fourteenth Amendment.  <u>See, e.g.</u>, <u>White</u>, 901 F.2d at
1507 (applying the <u>Hudson</u> analysis to an excessive force claim

31

brought by a pretrial detainee); <u>see</u> <u>also</u> <u>P.B. v. Koch</u>, 96 F.3d 1298, 1304 (9th Cir. 1996) (applying the <u>Johnson</u> factors to an excessive force claim brought by student against a high school principal).  Thus, the Court finds in the alternative that under a Fourteenth Amendment analysis Defendant Watanabe did not violate Decedent's constitutional rights.

Moreover, the Supreme Court has opined that, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."  <u>See</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 546 (1979).  Therefore, regardless of where Decedent fell on the custodial continuum his constitutional protections would be limited by his attempted escape from custody and interference with the secure transportation of prisoners.  Accordingly, the Court grants summary judgment in favor of Defendant Watanabe as to Plaintiffs' § 1983 excessive force claims.  <u>Id.</u>

### b. State Created Danger

In the alternative, Plaintiffs argue that Defendant Watanabe violated Decedent's constitutional rights by creating the danger that ultimately led to the use of deadly force.  <u>See</u> Opposition at 12.  In support of their proposition, Plaintiffs argue that by transporting Decedent in an old van with a

defective hasp, Defendant Watanabe created the situation that led to the use of lethal force.  Id. at 12-13.

The Court must determine whether Defendant Watanabe affirmatively placed Decedent in a danger that he otherwise would not have faced.  See Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061-63 (9th Cir. 2006); see, e.g., Munger v. City of Glasgow, 227 F.3d 1082, 1087 (9th Cir. 2000) (holding that police officers could be held liable under the state-created danger doctrine for the death by hypothermia of a visibly drunk patron, whom they ejected from a bar on a bitterly cold evening); L.W. v. Grubbs ("Grubbs I"), 974 F.2d 119, 120 (9th Cir. 1992) (holding that state employees could be held liable for the rape of a registered nurse assigned to work alone in the medical clinic of a medium security custodial institution that housed violent sex offenders); Wood v. Ostrander, 879 F.2d 583, 588 (9th Cir. 1989) (holding that there was a genuine issue of fact as to whether a state trooper acted with deliberate indifference when he left a woman stranded late at night in a high crime area).

In the Ninth Circuit, a state-created danger claim requires proof that a state actor affirmatively placed an individual in danger, and did so by acting with "deliberate indifference" to the danger.  See Kennedy, 439 F.3d at 1062; see also L.W. v. Grubbs ("Grubbs II"), 92 F.3d 894, 896 (9th Cir.

1996) ("We have not deviated from the principle that deliberate indifference on the part of the responsible official, to the safety of employees in the presence of known danger, created by official conduct, is sufficient to establish a due process violation under Section 1983 for injury caused in part by a state created danger."); see also Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 910 (3d Cir. 1997) (holding that the state's actions must evince a willingness to ignore a foreseeable risk); Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 531 (5th Cir. 1994) (holding that it is not enough to show that the state increased the danger of harm, the plaintiff must also show "that the state acted with the requisite degree of culpability in failing to protect the plaintiff").  This is a stringent standard of fault, requiring proof that an "actor disregarded a known or obvious consequence of his actions." Kennedy, 439 F.3d at 1064 (quoting Bryan County v. Brown, 520 U.S. 397, 410 (1997)).

The question before the Court is whether a jury could conclude that by not fixing the hasp on the van, Defendant Watanabe placed Decedent in a danger that he would otherwise not have faced and whether Defendant Watanabe acted with deliberate indifference to that danger.

In support of their position, Plaintiffs submit a report from the Department of Public Safety describing the

34

subject van as having double sided doors that were not able to be secured safely.  See Plaintiffs' Concise Statement Exhibit 8, p. 595.  In addition, Plaintiffs provide a transcript of an interview with Defendant Watanabe in which he explains that he knew the hasp on the van was defective.  See Plaintiffs' Concise Statement at Ex. 3, pgs. 14-15.

These facts standing alone are far too attenuated for a jury to find that by not fixing the hasp on the van, Defendant Watanabe created the danger that caused Decedent's death.  It was not the defective hasp that caused the danger that resulted in Defendant Watanabe's use of force.  Decedent smuggled a handcuff key into prison, unlocked his restraints, pushed open the van door, overpowered Defendant Watanabe, reportedly reached for Defendant Watanabe's gun and attempted to escape. Furthermore, Plaintiffs have not shown that it was Defendant Watanabe's responsibility to fix the hasp.  Thus, the Court finds that Plaintiffs can prove no set of facts which will show that Defendant Watanabe created the danger that caused an alleged violation of Decedent's constitutional rights.  Cf. Morse, 132 F.3d at 909 (holding that an attack on a school teacher was not the foreseeable result of leaving a school door open).  And even if he could establish such facts, the Court would still conclude Plaintiffs have not shown he acted with deliberate indifference.

c.   **Qualified immunity.**

Defendant Watanabe asserts that even if there was a violation of Decedent's constitutional rights, he is entitled to qualified immunity.  The defense of qualified immunity "shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Scott v. Henrich, 39 F.3d 912, 914 (9th Cir. 1994) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see also Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc); San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, 971 (9th Cir. 2005).  The purpose of qualified immunity is to protect officials from undue interference with their duties and from potentially disabling threats of liability.  See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1098 (9th Cir. 1994).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

The Supreme Court has set forth a two-part test to determine whether the defense of qualified immunity applies. First, the Court must consider whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

36

right." Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  If the injured party cannot show a constitutional violation, then a Defendant is entitled to qualified immunity.  Id.  On the other hand, if the injured party can establish a violation on the alleged facts, then the Court must resolve whether the violated right was clearly established, applying an objective, but fact specific inquiry.  Id. at 202.  To reject a defense of qualified immunity, the Court must find that "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Id.; see also Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007).  Determining whether governing law is clearly established is itself a question of law.  See Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993).  The Supreme Court has cautioned that a ruling on a qualified immunity defense "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  Saucier, 533 U.S. at 200.

Here, the Court finds that Decedent's constitutional rights were not violated by Defendant Watanabe's actions. Moreover, as discussed supra, the Court finds that under the laws clearly established at the time of the alleged constitutional violation, that a reasonable official in

Defendant Watanabe's position with the information he possessed would not believe that his actions would violate Decedent's constitutional rights.  See Id. at 202; see also Inouye, 504 F.3d at 712.  Therefore, the Court finds that Defendant Watanabe is entitled to qualified immunity.

     In sum, with regard to Plaintiffs' § 1983 claim, the Court grants summary judgment in favor of Defendant Watanabe and denies Plaintiffs' cross-motion for summary judgment with regard to Defendant Watanabe's § 1983 liability.

     **B.   State Law Claims**

     Plaintiffs ask the Court to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.  Supplemental jurisdiction over state law claims exists when "a federal claim is sufficiently substantial to confer jurisdiction and there is 'a common nucleus of operative fact between the state and federal claims.'"  See Maizner v. Dep't of Educ., 405 F.Supp.2d 1225, 1241 (D. Haw. 2005) (quoting Brady v. Brown, 51 F.3d 810, 816 (9th Cir. 1995).  However, "[t]he ultimate lack of merit of the federal claim does not mean that pendent jurisdiction cannot attach; the federal claim must be 'absolutely devoid of merit or obviously frivolous' to divest the court of pendent jurisdiction."  Brady 51 F.3d at 816 (quoting Imagineering, Inc. V. Kiewit Pac. Co., 976 F.2d 1303, 1309 (9th Cir. 1992)).  Once it is determined that a state law

claim arises out of a common nucleus of operative facts, a district court may nevertheless decline jurisdiction of a state law claim if: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." See 28 U.S.C. § 1367. Supplemental jurisdiction is a doctrine of discretion, not of Plaintiff's right. See City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172; United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966). Therefore, "[t]he decision whether to continue to exercise supplemental jurisdiction over state law claims afer all federal claims have been dismissed lies within the district court's discretion." Satey v. JPMorgan Chase & Co., 521 F.3d 1087, 1091 (9th Cir. 2008) (quoting Foster v. Wilson, 504 F.3d 1046, 1051 (9th Cir. 2007). The Court must consider judicial economy, convenience, fairness, and comity in deciding whether to exercise supplemental jurisdiction. Id. Here, while the Court has granted summary judgment in favor of Defendant Watanabe on all of Plaintiffs' federal claims, the Court will nevertheless maintain pendent jurisdiction over the state claims because there is a common nucleus of operative facts between the state

and federal claims and judicial economy, convenience, fairness, and comity weigh heavily in favor of maintaining jurisdiction in this case.

Plaintiffs assert Hawaii state law claims of battery, negligence and intentional and negligent infliction of emotional distress against Defendant Watanabe, both in his official and individual capacities.  The Court will first address the claims against Defendant Watanabe in his official capacity and then in his individual capacity.

### 1.    Official Capacity

As noted <u>supra</u>, a suit against a state official acting in his or her official capacity is tantamount to a suit against the state.  <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991).  The Eleventh Amendment "precludes the adjudication of pendent state law claims against nonconsenting state defendants in federal courts."  <u>Cholla Ready Mix, Inc. v. Civish</u>, 382 F.3d 969, 973-74 (9th Cir. 2004) (citing <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 106 (1984)).  Here, the State has not consented to be sued for these state claims in federal court, and therefore Defendant Watanabe in his official capacity is immune from such claims.  <u>See</u> <u>Maizner</u>, 405 F.Supp.2d at 1232 (noting that the State has not consented to be sued under Hawaii Revised Statutes ("HRS") § 662 in federal court); <u>see also</u> <u>Pahk v. Hawaii</u>, 109 F.Supp.2d 1262, 1268 (D. Haw. 2000) ("Although

the State of Hawaii consents to being sued in tort actions[,] . . . that consent applies only to cases brought in the state courts of Hawaii, not to cases brought in federal courts."); Office of Hawaiian Affairs v. Dep't of Educ., 951 F.Supp. 1484, 1491 (D. Haw. 1996).

To the extent that Plaintiffs seek any relief under state law from the State of Hawaii, or against Defendant Watanabe in his official capacity, those claims are dismissed.[16]

### 2.   Individual Capacity

Defendant Watanabe argues that even if Plaintiffs alleged meritorious state law claims against him, he is still entitled to the protection of what has been termed under Hawaii law "qualified or conditional privilege."  See Towse v. State, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982); see also Medeiros v. Kondo, 55 Haw. 499, 503, 522 P.2d 1269, 1271 (1974).  In order for an action to lie against an official action under a claim of privilege, the injured party must show by clear and convincing

_____

[16] Plaintiffs acknowledge that the state law claims against Defendant Watanabe in his official capacity are barred. See Tr. at 20.  Still, in their Opposition, Plaintiffs request leave to amend their Complaint to include the State of Hawaii under HRS § 662-2.  The Court denies Plaintiffs' request because any amendment to include the State of Hawaii would be futile.  See Flowers v. First Hawaiian Bank, 295 F.3d 966, 976 (9th Cir. 2002) (citing Cook, Perkiss & Liehe, Inc. v. Northern California Collection Serv., Inc., 911 F.2d 242, 247 (9th Cir. 1990)).  In the alternative, the Court denies Plaintiffs' request because the motion deadline to join additional parties expired on January 25, 2008.

evidence that "the official had been motivated by malice and not by an otherwise proper purpose."  Towse, 64 Haw. at 632, 647 P.2d at 702.  "Malicious or improper purpose" is defined in its "ordinary and usual sense."  See Awakuni v. Awana, 115 Haw. 126, 141, 165 P.3d 1027, 1042 (2007).  Thus, the Hawaii Supreme Court defines "malice" as "the intent, without justification or excuse, to commit a wrongful act, reckless disregard of the law or of a person's legal rights, and ill will; wickedness of heart."  Id. (internal quotation marks omitted) (quoting Black's Law Dictionary 976 (8th ed. 2004).

Generally the question of "malice" is a question for the jury.  See Id. at 5, 525 P.2d at 1128.  "However, when this issue has been removed from the case by uncontroverted affidavits and depositions, and the moving party is entitled to judgment as a matter if law, summary judgment will be granted."  Id.  As noted supra, Decedent used a smuggled key to free himself from his hand and leg restraints.  See Gunja Report at 4, 13, 16.  Decedent engaged in a struggle with Defendant Watanabe, who had repeatedly told him to "give up."  Plaintiffs Concise Statement Ex. 3, p. 6.  Decedent then reached for Defendant Watanabe's gun and eventually overpowered him in his effort to unlawfully escape custody.  Moreover, Defendant Watanabe shouted "stop" before aiming at Decedent's center mass and firing one shot, unfortunately hitting him in the back of

the head.  It would have been unreasonable for Defendant Watanabe to chase Decedent because he would have been forced to abandon ACO Almarza, who was unarmed at the time, with the nine other inmates.  The Court reiterates its determination that Defendant Watanabe acted in good faith and to restore discipline and not maliciously or sadistically to cause harm.  The Court concludes there is no clear and convincing evidence that Defendant Watanabe shot Decedent with the intent, without justification, to commit a wrongful act, or in reckless disregard of the law or of Decedent's rights, or with any ill will or wickedness of heart.  Thus, the Court grants summary judgment in favor of Defendant Watanabe because even if Plaintiffs presented meritorious state law claims, those claims would be barred by the qualified privilege.

## II.  DEFENDANT MACDONALD

### A.  Section 1983

Plaintiffs assert that by failing to properly "equip, train and/or supervise Defendant Watanabe," Defendant MacDonald was the proximate cause of Decedent's death.  <u>See</u> Compl. ¶ 26. Plaintiffs additionally argue that Defendant MacDonald promulgated policies that were so deficient that they were the moving force behind the constitutional violation.  <u>See</u> Opposition at 5, 15.  Finally, Plaintiffs contend that Defendant MacDonald created the danger that led to the violation of

43

Decedent's constitutional rights.   The Court will address these arguments against Defendant MacDonald in his official capacity and then in his individual capacity and will finally address whether Defendant MacDonald is entitled to qualified immunity.

### 1.   Official Capacity

As noted supra, the Eleventh Amendment shields official capacity defendants from liability.  See Hafer, 502 U.S. at 25; see also Will, 491 U.S. at 71.  Just as Defendant Watanabe was shielded from liability in his official capacity, so to is Defendant Macdonald.  The Court finds that Plaintiffs' § 1983 claim against Defendant MacDonald in his official capacity is barred by the Eleventh Amendment.  Accordingly, the Court grants summary judgment in favor of Defendant MacDonald in his official capacity.[17]

### 2. Individual Capacity

"A prison official violates the Eighth Amendment only when he or she 'knows of and disregards an excessive risk to inmate health or safety.'"  See Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir. 2001) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994).  This standard requires the official be subjectively aware of the risk; it is insufficient that the official

---

[17]   Plaintiffs concede that all federal claims against Defendant MacDonald in his official capacity are barred.  See Tr. at 20.

objectively should have recognized the danger.  Id.; see also Farmer, 511 U.S. at 838.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." Farmer, 511 U.S. at 837.  Thus, under this Eighth Amendment analysis, Plaintiffs must establish that Defendant MacDonald acted with deliberate indifference to the alleged violation of Decedent's constitutional rights.  Id.

### a.   Failure to Train

Plaintiffs allege that Defendant MacDonald's failure to "equip, train and/or supervise Defendant Watanabe" resulted in a violation of Decedent's constitutional rights.  See Compl. ¶ 26.  Generally, supervisors are not vicariously liable for the actions of their subordinates under § 1983.  See Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir. 1989).  "A supervisor may be liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  Jeffers, 267 F.3d at 915.  The supervisor's wrongful conduct must amount to deliberate indifference to Decedent's constitutional rights. See City of Canton v. Harris, 489 U.S. 378, 388 (1989); see also Cannel v. Lightner, 143 F.3d 1210, 1214 (9th Cir. 1998). Because Defendant MacDonald was not personally involved in the

alleged violation of Decedent's constitutional rights, the Court must assess whether there was a constitutional violation, and if so, whether there was a causal connection between Defendant MacDonald's actions and the alleged deprivation of Decedent's constitutional rights.

Plaintiffs argue that Defendant Watanabe violated Decedent's constitutional rights by shooting Decedent unreasonably without being properly qualified to carry a firearm.  Plaintiffs contend that Defendant MacDonald is liable for Defendant Watanabe's actions.  Defendant Watanabe took his last firearm re-qualification exam on March 7, 2006, approximately thirteen months before he shot Decedent.  See Gunja Report at 35.  Generally, officers are required to re-qualify to carry firearms every twelve months.  See Opposition at 7.  However, Defendant Watanabe presented evidence that the qualification remains valid until the shooting range has space to accommodate the administration of the officer's re-qualification exam and space was limited because priority was given to state, city and county law enforcement agencies.  See Gunja Report at 33.  Moreover, Defendant Watanabe has passed all of his re-qualification exams without issue.

Even assuming Defendant Watanabe violated Decedent's constitutional rights, Plaintiffs have presented no evidence that Defendant MacDonald was deliberately indifferent to

Defendant Watanabe's training or supervision.  Moreover,
Plaintiffs have presented no evidence that Defendant MacDonald
had any knowledge of, or was responsible for, Defendant Watanabe
taking his re-qualification exam.  Thus, the Court finds that
Defendant MacDonald is not liable for Defendant Watanabe's
alleged violation of Decedent's constitutional rights.

### 2.   Promulgation of Use of Force Policies

In addition, Plaintiffs argue that as the warden of
HCCC, Defendant MacDonald promulgated and maintained policies
regarding the use of lethal force that violated Decedent's
constitutional rights.  <u>See</u> Opposition at 5, 15.  To prevail on
this type of constitutional challenge, Plaintiffs must show that
the policy is "so deficient that the policy itself is a
repudiation of constitutional rights and is the moving force of
the constitutional violation."  <u>See</u> <u>Jeffers</u>, 267 F.3d at 914
(quoting <u>Redman v. County of San Diego</u>, 942 F.2d 1435, 1446 (9th
Cir. 1991)).  Here, Plaintiffs challenge ERC 03.01, which states
that "[t]he use of force shall be restricted to the minimum
degree necessary to regain control of or to repel attack by a
restraining [sic] <u>inmate</u>."  <u>See</u> Gunja Report at 6 (quoting ERC
03.01) (emphasis added).  Moreover, "[i]f an escape or escape
attempt occurs in the community, escorting officers shall
initiate immediate pursuit, if circumstances permit."  <u>Id.</u>  In
addition the procedure requires "all other means of apprehension

47

and control shall be exhausted" before an officer is to use

deadly force.  Id.  Plaintiffs also challenge ERC 14.01 which

authorizes the use of force against "offenders who attempt to

escape from the supervision of escorting transporting officers

outside the boundaries of a correctional or holding facility."

See Gunja Report at 5.  Plaintiffs argue that the promulgation

of these policies are unconstitutional because they do not

require an officer to act any differently when apprehending an

escaping suspect under the Fourth Amendment or apprehending a

convicted criminal under the Eighth Amendment.  See Tr. at 15.

The Court finds that DPS policies allow for the use of force

only in those situations that would not infringe on an

individual's constitutional rights.  See Jeffers, 267 F.3d at

914-15 (upholding as constitutional a similar use of force

policy); see also Gravely, 142 F.3d at 350 (upholding a similar

administrative regulation as constitutional).  Moreover, the

Supreme Court in Garner cited with approval the Model Penal

Code, which states that "a guard or other person authorized to

act as a peace officer is justified in using any force,

including deadly force, that he believes to be immediately

necessary to prevent the escape of a person from a jail, prison,

or other institution for the detention of persons charged with

or convicted of a crime."  See Model Penal Code § 3.07(3)

(emphasis added).  Under the Model Penal Code, an officer is not

48

required to distinguish his conduct when trying to prevent the
escape of a convicted criminal or a person charged with a crime.
The language and protocol in the Model Penal Code is very
similar to that outlined in ERC 03.01 and ERC 14.01.  Thus, the
Court finds that ERC 03.01 and ERC 14.01 are constitutional.
Moreover, Plaintiffs have failed to show that the promulgation
of these policies caused the alleged repudiation of Decedent's
constitutional rights.  See Jeffers, 267 F.3d at 914-15.  Thus,
the Court finds that the promulgation of this policy did not
violate Decedent's constitutional rights.

### 3.   State Created Danger

Plaintiffs argue that Defendant MacDonald is liable
under a state created danger theory.  Plaintiffs are unclear as
to whether they contend Defendant MacDonald is personally liable
for creating the danger that led to the alleged violation of
Decedent's constitutional rights or whether Defendant MacDonald
is vicariously liable for Defendant Watanabe's actions.  See
Opposition at 12.  The Court will address both arguments.

A state-created danger claim requires Plaintiffs to
prove that Defendant MacDonald affirmatively placed Decedent in
danger, and did so by acting with "deliberate indifference" to
the danger.  See Kennedy, 439 F.3d at 1062.  Plaintiffs have not
presented any evidence that Defendant MacDonald knew or
reasonably should have known that the subject vehicles hasp was

49

defective or that by failing to fix the defective hasp, Decedent's constitutional rights might be violated.   Nor have Plaintiffs shown that the condition of the vehicle was Defendant MacDonald's responsibility.   Therefore, the Court finds that Plaintiffs have failed to show that Defendant MacDonald created the danger that led to a violation of Decedent's constitutional rights.

For Defendant MacDonald to be vicariously liable for Defendant Watanabe's actions, Plaintiffs must show a casual connection between Defendant MacDonald's wrongful conduct and the constitutional violation.   See Jeffers, 267 F.3d at 915. Defendant MacDonald's conduct must amount to deliberate indifference to Decedent's constitutional rights.   See Harris, 489 U.S. at 388; see also Cannel, 143 F.3d at 1214.

As the Court has already found supra, Defendant Watanabe did not create the danger that led to the alleged violation of Decedent's constitutional rights.   Even if the Court had held otherwise, Defendant MacDonald would still not be vicariously liable for Defendant Watanabe's actions because Plaintiffs have presented no evidence that Defendant MacDonald knew of, or was responsible for, the defective hasp.   Thus, the Court finds that Defendant MacDonald is not liable for Defendant Watanabe's alleged violation of Decedent's constitutional rights.

### 4. Qualified Immunity

As the Court described earlier, to determine whether Defendant MacDonald is entitled to qualified immunity, the Court must analyze whether Plaintiffs have sufficiently shown that he violated a constitutional right and if so, whether that right was clearly established.  See Saucier, 533 U.S. at 201-02. Here, the Court finds that Plaintiffs have not established Defendant MacDonald violated Decedent's constitutional rights. Further, the Court finds that a reasonable official in Defendant MacDonald's position with the information he possessed would not believe that his conduct would violate the clearly established law.  Id.; see also Inouye, 504 F.3d at 712.  The Court finds Defendant MacDonald is entitled to qualified immunity. Therefore, with regard to Plaintiffs' § 1983 claims, the Court grants summary judgment in favor of Defendant MacDonald in both his official and individual capacity because Plaintiffs have failed to show Defendant MacDonald violated Decedent's constitutional rights.

### B.   State Law Claims

As noted supra, in determining whether to exercise supplemental jurisdiction over Plaintiffs' state law claims against Defendant MacDonald, the Court must determine whether there is a common nucleus of operative facts with the federal law claims and weigh various factors including judicial economy,

convenience, fairness and comity.   See Satey, 521 F.3d at 1091.
Here, while the Court has granted summary judgment in favor of
Defendant MacDonald on all of Plaintiffs' federal claims, the
Court will nevertheless maintain pendent jurisdiction over the
state claims because there is a common nucleus of operative
facts between the state and federal claims and judicial economy,
convenience, fairness, and comity weigh heavily in favor of
maintaining jurisdiction in this case.   Thus, the Court will
address the claims against Defendant MacDonald in his official
capacity and then the claims against him in his individual
capacity.

### 1.   Official Capacity

As the Court explained in more detail supra, the
Eleventh Amendment "precludes the adjudication of pendent state
law claims against nonconsenting state defendants in federal
courts."   Cholla Ready Mix, Inc., 382 F.3d at 973-74.   Here, the
State has not consented to be sued for these state claims in
federal court, and therefore Defendant MacDonald in his official
capacity is immune from such claims.   See Maizner, 405 F.Supp.2d
at 1232.   Thus, the Court grants summary judgment in favor of
Defendant MacDonald in his official capacity.[18]

---

[18] Plaintiffs acknowledge that the state law claims against
Defendant MacDonald in his official capacity are barred. See
Opposition at 14.  Still, Plaintiffs' request leave to amend
their Complaint to include the State of Hawaii under HRS § 662-2.
However, the Court denies Plaintiffs' request because any

## 2.    Individual Capacity

In order for an action to lie against an official action under a claim of privilege, the injured party must show by clear and convincing evidence that "the official had been motivated by malice and not by an otherwise proper purpose." Towse, 64 Haw. at 632, 647 P.2d at 702.  Plaintiffs have made absolutely no showing that Defendant MacDonald acted with malice in failing to train, equip or supervise Defendant Watanabe, in promulgating the DPS polices or in failing to fix the defective hasp on the transportation van.  Moreover, Plaintiffs concede Defendant MacDonald did not act with malice.  See Tr. at 10.[19/] Thus, the Court grants summary judgment in favor of Defendant MacDonald on all state law claims because he is entitled to qualified privilege.

## III. Punitive Damages

Plaintiffs argue they are entitled to punitive damages under federal and state law.  Punitive damages may be assessed under § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless

---

amendment to include the State of Hawaii would be futile.  See Flowers, 295 F.3d at 976.  In the alternative, as noted supra, the Court denies Plaintiffs request because the motion deadline to join additional parties expired on January 25, 2008.

[19/] At the Hearing, Plaintiffs' attorney, Eric Seitz, stated that "[Plaintiffs] do not allege any malice on behalf of Mr. McDonald so I think that's clear I don't want there to be any lack of clarity about that."

or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).  Under Hawaii state tort law, punitive damages may be awarded when a defendant acts with malice, oppression or gross negligence.  <u>Ditto v. McCurdy</u>, 98 Haw. 123, 131 44 P.3d 274, 282 (2002).  In any event, the Court finds an award of punitive damages is inappropriate because Plaintiffs have failed to show Plaintiffs are liable for the underlying claims.  Thus, the Court grants summary judgment in favor of Defendants on this issue.

**IV.  Rule 56(f) Motion**

Pursuant to Federal Rule of Civil Procedure 56(f) ("Rule 56(f)"), Plaintiffs request that the Court deny summary judgment because to date, they have conducted only limited discovery.  <u>See</u> Opposition at 13-14, 17.  Rule 56(f) reads in pertinent part: **"When Affidavits Are Unavailable.** If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . ."  Plaintiffs have not presented the Court with any affidavits showing that they could not present essential facts in the Opposition.  Moreover, since filing the Complaint over a year ago on April 26, 2007, Plaintiffs have conducted absolutely no discovery at all.  <u>See</u> Watanabe's Reply at 11.  Plaintiffs state that the Court should grant them additional time to obtain affidavits and depositions

"essential to justify [their] position," but have not given any indication of what information they need.  Thus, the Court denies Plaintiffs Rule 56(f) motion.

### **CONCLUSION**

The Court reiterates that the findings and conclusions by this Court are fully supported by Joseph E. Gunja.  For the foregoing reasons, the Court GRANTS Defendant Watanabe's Motion for Summary Judgment; GRANTS Defendant MacDonald's Motion for Summary Judgment; and DENIES Plaintiffs' Cross-Motion for Summary Judgment.


IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 11, 2008.



                              _____
                              Alan C. Kay
                              Sr. United States District Judge


Leialoha v. MacDonald, Civ. No. 07-00218 ACK-KSC, Superceding Order Granting Defendant Pete MacDonald's Motion for Summary Judgment; Granting Defendant Bryan Watanabe's Motion for Summary Judgment; And Denying Plaintiffs' Cross-Motion for Summary Judgment.